# In the United States Court of Federal Claims

No. 23-2172

Filed: May 24, 2024†

**CROWLEY GOVERNMENT SERVICES, INC.,**

    *Plaintiff*,

v.

**THE UNITED STATES,**

    *Defendant*.

*James Y. Boland,* with *Christopher G. Griesedieck Jr.* and *Lindsay M. Reed*, Venable LLP, Tysons, Virginia, for Plaintiff.

*Daniel Bertoni*, Trial Attorney, Commercial Litigation Branch, Civil Division, *Steven J. Gillingham*, Assistant Director, *Patricia McCarthy*, Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, U.S. DOJ, Washington, D.C.; with *Todd P. Federici* and *Kurt M. Vanbennekom*, Attorneys, U.S. Transportation Command, for the United States.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

    Resilience is necessary to contract with the federal government: fall seven times, stand up eight.[1] Though governed by the basic tenets of contract law, the multifaceted nature of contracting with the United States demands a comprehensive awareness of the government's procurement objectives and requirements. The ever-evolving landscape of government contracting necessitates continuous adaptation to new policies, guidelines, and compliance measures, making it a formidable undertaking for entities seeking to engage in contractual arrangements with federal agencies. The United States has the authority to establish and enforce its own contract terms, provided they are within legal bounds. A prospective bidder's disagreement with certain contract terms does not render those terms arbitrary or wrongful.

---

† This Opinion was originally filed under seal on May 22, 2024, (ECF No. 34). The Court provided parties the opportunity to review this Opinion for any proprietary, confidential, or other protected information and submit proposed redactions. In a Joint Status Report filed May 23, (ECF No. 36), the parties indicated that no redactions were required.

[1] Translated from Japanese proverb, originally "Nana korobi, ya oki."

Here, Plaintiff, Crowley Government Services, Inc. ("Crowley"), and the United States are engaged in a multiverse of litigation centered on their transportation-based contract. That litigation began, and continues, in the D.C. District Court and before a different judge of this Court. The parties here move for judgment on the administrative record. Further, Crowley moves to supplement the administrative record with post hoc documents. For the reasons stated below, the United States' Motion for Judgment on the Administrative Record is **GRANTED**. Crowley's Motions for Judgment on the Administrative Record and to Supplement the Record are **DENIED**.

## I. Background

This pre-award bid protest challenges purported improprieties in a solicitation issued by the United States Transportation Command ("TRANSCOM") for the next Defense Freight Transportation Services contract ("DFTS II").[2] (Administrative Record ("AR__") at 1613; AR1733, ECF No. 10). Under DFTS II, the contractor will provide transportation support and logistics services to the Department of Defense ("DoD"). (AR12).

### A. DFTS I Contract and Litigation

Crowley is a logistics, marine, and energy solutions company serving commercial and government customers. (Compl. at 3, ECF No. 1). Crowley is the DFTS I incumbent contractor. (*Id.* at 7). The DFTS I contract requires Crowley to support "[g]overnment agency reviews and audits of all services and support provided," but does not otherwise specify any government audit procedures. (Compl. Ex. 2 at 48, ECF No. 1-2). The initial iterations of this contract—particularly audit provisions to ensure quality control—have been the source of much contention. In the predecessor to Crowley's incumbent DFTS I contract, the Defense Transportation Coordination Initiative, the Defense Contract Audit Agency ("DCAA") completed those audits. (AR3828). However, in Crowley's completion of the DFTS I contract, the General Services Administration ("GSA") began auditing Crowley's invoices. (AR2260).

Crowley disputed GSA's Notice of Overcharges and filed several claims with the Contracting Officer ("CO") in accordance with the contract's disputes clause. (AR2410–21). Between August and December 2020, the CO issued three Final Decisions, concluding that each category of GSA's challenged Notice of Overcharges "should not have been issued" and were "erroneous." (*Id.*); *see also Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, No. 21-CV-2298 (BAH), 2023 WL 4846719, at *12 (D.D.C. July 28, 2023) (*Crowley II*). In 2021, Crowley initiated an action against GSA in the U.S. District Court for the District of Columbia for declaratory and injunctive relief under the Administrative Procedure Act to stop GSA from conducting unlawful audits. *Crowley Gov't Servs., Inc.*, 2023 WL 4846719.

---

[2] TRANSCOM is a unified, functional combatant command providing support to other U.S. combatant commands, the military services, and defense agencies. *About TRANSCOM*, TRANSCOM, https://www.TRANSCOM.mil/cmd/aboutustc.cfm (last visited Apr. 23, 2024).

Separate from recovering erroneous overcharges,[3] and relevant to this litigation, Crowley contended that GSA exceeded its authority under the Transportation Act by auditing Crowley's invoices. (Compl. at 8); *see also* 31 U.S.C. § 3726(b). This is premised on the argument that the Transportation Act does not extend to Federal Acquisition Regulation ("FAR")-based contracts and that Crowley, not acting as a carrier, did not issue "transportation bills" to TRANSCOM as stipulated in the Transportation Act.[4] (Compl. at 8).

On the parties' dispositive motions, the D.C. District Court summarized its holding succinctly:

> This case boils down to two questions: Is GSA authorized to audit Crowley's contract with [ ]TRANSCOM, pursuant to the Transportation Act as GSA urges? If so, but GSA's audit determinations are disputed by Crowley, what statutory dispute resolution scheme applies? The answer to the first question is yes, Crowley and defendants both incorrectly attempt to shoehorn into Section 3726(b) a requirement that Crowley be a "carrier" or "freight forwarder" for its contract to be subject to GSA audit authority. That is not a requirement under that particular subsection, thus whether Crowley is a carrier need not be decided. The answer to the second question is that the procedures set forth in the [Contract Disputes Act] apply because there is no dispute between Crowley and [ ]TRANSCOM, channeling Crowley's challenges to any resulting adverse audit determinations by GSA to a [ ]TRANSCOM Contracting Officer, not GSA's more onerous administrative appeals process.

---

[3] TRANSCOM admits that some of GSA's audits were not performed accurately. (Mar. 19, 2024 Oral Argument Transcript ("OA Tr.") 28:8–10, ECF No. 22). After two years of litigation, GSA refunded Crowley "nearly $30 million." *Crowley II* at *2 (*see also* OA Tr. 11:14–17, 28:11–12). Crowley claims that several million dollars remain at issue, (OA Tr. 11:22–23), however litigation is ongoing to resolve "precisely the amount that is going to be due." (OA Tr. 28:22–25); *see also Crowley Gov't Servs. v. United States*, No. 21-cv-1405-CNL (Fed. Cl. filed May 27, 2021) (stayed pending a D.C. Circuit decision).

[4] Initially, the D.C. District Court dismissed the case due to lack of jurisdiction. *Crowley Gov't Servs. v. Gen. Servs. Admin.*, No. 21-cv-2298, 2021 WL 4940953 (D.D.C. Oct. 22, 2021) (finding that Crowley "has a contract dispute with the government exceeding $10,000 in value, and the forum prescribed by statute to hear such disputes is the Court of Federal Claims."). However, the D.C. Circuit overturned this decision, determining that Crowley's claim was not primarily rooted in the DFTS I contract. Instead, the appeals court found the actions of GSA to be more akin to tortious interference. *See Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1109 (D.C. Cir. 2022) ("[W]e find convincing Crowley's analogy of its claim to the common law claim of tortious interference with contractual relations.") ("*Crowley I*").

*Crowley II* at *17. Crowley appealed the totality of the District Court's findings.[5] *Crowley II*, appeal docketed No. 23-5183 (D.C. Cir. Aug. 16, 2023).

### B. DFTS II Contract and GAO Protest

On July 27, 2023, the day before the D.C. District Court released its decision, TRANSCOM issued its request for proposals ("RFP") for DFTS II, the follow-on contract to DFTS I.[6] (AR1613–17). The Performance Work Statement ("PWS") provides for a single contractor to manage DoD's freight needs within the continental United States, with services encompassing "support from receipt of the shipment request through final payment for services rendered." (Compl. Ex. 2; AR3955). Apart from subcontracting with carriers, the PWS mandates that the contractor must offer centralized management capabilities. (AR1979). This includes a variety of tasks, such as creating a web-based transportation management system and associated software that can integrate with DoD systems, offering ongoing technical assistance, stationing full-time staff at four Defense Logistics Agency sites, and providing training and additional support services. (*See generally* AR1980–2023). Although the DFTS II contractor may itself hire other transportation providers as subcontractors, (AR2000), the contractor will be responsible for ensuring required transportation is successfully completed, (AR1977), and the contractor must accept liability for goods during transport, (AR2001).

Following the District Court's decision regarding the DFTS I contract, on August 8, TRANSCOM amended the PWS to conform with the D.C. District Court's ruling. (Mar. 19, 2024 Oral Argument Transcript ("OA Tr.") 26:1–2, 33:21–24, ECF No. 22). The modified PWS specifies that under "Title 41 CFR Part 102-118 (as amended)" and "31 U.S.C. § 3726 (the Transportation Act, as amended)," the contract is subject to GSA audits. (AR2007). TRANSCOM claims that it included this requirement in the DFTS II solicitation expressly so that all prospective offerors were informed of the possibility of GSA audits, and the risk could be factored into their pricing. (AR3321). The solicitation also incorporates FAR clause 52.233-1, which provides for dispute resolution under the Contracts Disputes Act ("CDA"). (AR1686).

Crowley first sought reprieve at the Government Accountability Office ("GAO") presenting two arguments. First, Crowley argued that the solicitation was flawed as it incorrectly renders the contract, once awarded, subject to GSA audits under the Transportation Act. (AR2245–46). Crowley further alleged that TRANSCOM neglected to investigate and address an inherent organizational conflict of interest ("OCI") related to impaired objectivity associated with the solicitation. (*Id.*). This protest was to no avail. On December 19, 2023, the GAO dismissed Crowley's protest. (AR3947). The GAO explained that Crowley's first claim was already the subject of ongoing litigation in the district court and the court of appeals, rendering any GAO decision futile and potentially academic. (AR3951–52). Furthermore, the GAO stated that Crowley failed to present credible grounds for an OCI, as GSA's audits were authorized by

---

[5] Crowley's appeal remains pending as of the date of this entry.

[6] RFP No. HTC711-23-R-R009.

statute and any potential OCI would stem from a third-party contract between GSA and its auditor. (AR3953). Crowley now tries anew in this Court.[7]

## II. Analysis

### A. Standard of Review

According to 28 U.S.C. § 1491(b)(4), the Court reviews agency procurement decisions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Under the APA standard, "[i]n a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013). Thus, judicial review of agency action under the APA proceeds on two tracks: the Court could find (1) the agency's decision lacked either a rational basis or support from the administrative record or was arbitrary and capricious; and/or (2) the agency's procurement procedure involved a violation of regulation or statute. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009). To obtain relief, after showing that the procuring agency violated the law or acted arbitrarily and capriciously, the protestor must also show that the agency's violation was prejudicial to the protestor. *Glenn Def. Marine*, 720 F.3d at 907.

"Under the 'arbitrary and capricious' standard[,] the scope of review is a narrow one. A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (internal quotations omitted). The Court may not substitute its own judgment for that of the agency. *Id*. But the agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

Unlike the standard applied in summary judgment motions, "the existence of genuine issues of material fact does not preclude judgment on the administrative record" under RCFC 52.1. *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011); *see also* RCFC 56. Rather, the Court's inquiry is whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)). Taken together, the standards for success by a plaintiff are substantial.

### B. Discussion

Crowley argues that the language added by TRANSCOM conforming to the D.C. District Court's ruling is a loophole allowing GSA to audit Crowley should the appellate court side with Crowley. (Pl.'s MJAR at 34, ECF No. 14). Specifically, Crowley contends TRANSCOM

---

[7] The Court understands that Crowley's purpose of litigation is to preserve its rights under *Blue & Gold, Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007). (OA Tr. 17:1–25). However, that is not at issue before this Court.

arbitrarily incorporated the audit language to prevent Crowley from exercising its rights under the APA to challenge future agency action as unlawful. (*Id.*). In support, Crowley argues that the subject RFP contains terms that are arbitrary, capricious, and contrary to law, because the GSA does not have the authority to audit the contractor and, even if it did, the DFTS II contractor will not act as a "carrier" in its performance. (*Id.* at 14–34). Second, Crowley argues that the RFP is unlawful because it introduces an inherent conflict of interest into the procurement by authorizing GSA to pay a contractor a percentage-based commission based on the number of overcharges it identifies. (*Id.* at 34–37).

The United States argues that the Court must dismiss Crowley's repetitive arguments based on the Transportation Act that have already been dismissed, as well as Crowley's strained reinterpretation of what constitutes an OCI. (Def.'s xMJAR, ECF No. 15). Because the Court is precluded from determining whether GSA has the appropriate authority to audit the DFTS II contract, and finds that Crowley has not established the existence of an OCI, the Court agrees with the United States.

> i. Whether GSA has the authority to audit the DFTS II contract is precluded by the D.C. District Court decision and is subject to the D.C. Circuit Court's decision once rendered.

As an initial matter, the Transportation Act establishes a comprehensive scheme for GSA to audit, collect overpayments, adjudicate, and resolve appeals in connection with transportation bills of carriers performing transportation who present their bills to the government for payment. *See* 31 U.S.C. § 3726. Generally, Section 3726 provides authority for GSA audits, both pre-payment and post-payment, of bills from a "carrier or freight forwarder," *see id*. §§ 3726(a)(1), (d), (h), & (i)(1), and, in some subsections, refers more broadly separately or disjunctively to "transportation bills" or "transportation services," *see id.* §§ 3726(b), (c)(1).

Crowley argues that TRANSCOM wants access to transportation audits through the GSA rather than using its own resources or those of the Defense Contract Audit Agency ("DCAA").[8] (Pl.'s MJAR at 1 (citing https://www.dcaa.mil/)). Crowley contends that this action contravenes the statute. (*Id.* at 14–34). Crowley specifically states that the statute enabling GSA to carry out transportation audits for federal agencies, as outlined in 31 U.S.C. § 3726(b), does not encompass the audits specified in the RFP. (*Id.* at 16–21).[9] Rather, Crowley asserts that TRANSCOM seeks audits of invoices submitted by a non-carrier operating under a FAR-based contract subject to the CDA. (*Id.* (citing 41 U.S.C. §§ 7101-09)). For Crowley, this amounts to TRANSCOM's unlawful attempt to empower GSA to audit non-carriers performing under a FAR-based contract and subject to the CDA. (*Id.* at 21–29, 2) ("The Transportation Act and

---

[8] DCAA's purpose is to provide "audit and financial advisory services to DoD" and "financial oversight of government contracts." *Our Agency*, Defense Contract Audit Agency, https://www.dcaa.mil/ (last visited May 14, 2024).

[9] Section 1.12.19.1 of the RFP's PWS declares, "This contract is subject to GSA audits pursuant to 31 U.S.C. § 3726 (the Transportation Act, as amended) and Title 41 CFR Part 102-118 (as amended)." (AR2007).

CDA establish mutually exclusive dispute resolution procedures and therefore, the statute (including its audit provision) cannot apply to the same contract." (citing *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1018 (Fed. Cir. 1995))).

Crowley states that GSA's audits under 31 U.S.C. § 3726(b) violate the CDA because the Transportation Act and its implementing regulations make GSA, rather than the CO, responsible for deciding whether the DFTS II contractor has overbilled the government. (Pl.'s MJAR at 26 (citing 41 C.F.R. §§ 102-118.285(i) (GSA may "direct[]" agency to make deductions); *id.* §§ 102-118.300(a)-(b) (agency "must submit" carrier appeals to GSA, which "will review" and "issue a decision"); *id.* §§ 102-118.400, 102-118.405 (GSA conducts post-payment audits of bills and "decide[s] their validity, propriety, and conformity," including "subsequent adjustments and collection actions"); *id.* § 102-118.495 (procuring agency may not appeal a decision of GSA's designated review board))). According to Crowley, the act of transferring authority to GSA unlawfully contradicts the clear provisions within the FAR and CDA, as these guidelines explicitly grant the CO exclusive decision-making power over all aspects relating to the contract. (*Id.* at 24 (citing *e.g.*, 41 U.S.C. § 7103(a)(1); FAR 1.602-1(a); FAR 1.602-2)). Crowley posits that "[u]nder the current RFP, if GSA is entitled to audit and collect alleged overpayments, the contractor will have no right to collect interest if the [CO] later finds GSA's audit determinations and associated overpayments to be improper." (*Id.* at 27 (citing 41 C.F.R. § 102-118.465)).

The United States argues that Crowley is precluded from raising the issue of whether GSA is permitted to conduct these audits on FAR-based contracts. (Def.'s xMJAR at 10–15). The United States specifies that "[r]ecognizing that the applicability of the Transportation Act audit provision was the issue there (as it is here), the district court decided precisely that issue, holding that 'Section 3726(b), by its plain terms, thus empowers GSA to audit the DFTS Contract.'" (*Id.* at 11 (citing *Crowley II*, 2023 WL 4846719, at *20; AR3117). The United States further cites that "the GAO dismissed Crowley's protest, recognizing that Crowley was presenting an issue identical to the issue being litigated in district court." (*Id.* (citing AR3951–52)).

"Considerations of comity and orderly administration of justice dictate that two courts of equal authority should not hear the same case simultaneously." *Wash. Metro. Area Transit Auth. v. Ragonese*, 617 F.2d 828, 830 (D.C. Cir. 1980). The doctrine of issue preclusion, or collateral estoppel, "protects the finality of judgments by precluding relitigation in a second suit of claims actually litigated and determined in the first suit." *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012) (internal quotations omitted). A party seeking to apply the doctrine of issue preclusion must show: "(1) the previous determination was necessary to the decision; (2) the identical issue was previously litigated; (3) the issue was actually decided in a decision that was final, valid, and on the merits; and (4) the party being precluded from relitigating the issue was adequately represented in the previous action." *United Access Techs., LLC v. Centurytel Broadband Servs. LLC*, 778 F.3d 1327, 1331 (Fed. Cir. 2015). "[T]he party asserting preclusion bears the burden of showing with clarity and certainty what was determined by the prior judgment." *Id.* (internal citations and quotations omitted).

Crowley urges the Court to find that preclusion does not apply because the claims pending here and before the D.C. District Court are not the same. (OA Tr. 6:11–12). But issue preclusion "does not include any requirement that the claim (or cause of action) in the first and

second suits be the same. Rather, application of issue preclusion centers around whether an issue of law or fact has been previously litigated." *In re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994). Therefore, the fact that the claims differ is of no consequence.

The issues before this Court were undoubtedly previously litigated. Crowley characterizes the D.C. District Court's findings to summarily hold "that 31 U.S.C. § 3726(b) authorized GSA to audit non-carriers based solely on the absence of the word 'carrier' in that subsection." (Pl.'s MJAR at 5). However, the D.C. District Court's decision goes further than just holding that GSA had the authority to audit the subject contracts; the D.C. District Court also held that the CDA governed those contracts. *Crowley II*, 2023 WL 4846719, at *23. Among other things, the D.C. District Court found that the Transportation Act applies to FAR-based contracts subject to the CDA because the CDA does not conflict with GSA's audit authority under the Transportation Act and that the two statutes can be harmonized and applied to the same contract. *Id.* at *17; (*see also* OA Tr. 4:19–22 (Crowley: "At best, the issues that were decided by the District Court are the interpretation of 3726(b), GSA's audit authority, and the application of that statute, the Transportation Act, to a FAR-based contract.")). As the D.C. District Court held, these contract audits present no conflict between the remedial schemes of the Transportation Act and the CDA. *Crowley II*, 2023 WL 4846719, at *23; (AR3123–24). These determinations, identical to the ones required to resolve Crowley's claim here, were the crux of the D.C. District Court's decision and therefore necessary.

Crowley's takes umbrage with TRANSCOM "ignoring" provisions of the CDA dictating dispute resolution procedures, arguing they cannot co-exist with the Transportation Act. (*See* Pl.'s MJAR at 10, 13). This too has already been addressed. The D.C. District Court stated that if the DFTS II contractor submits a CDA claim based on the results of an audit conducted by GSA, a TRANSCOM CO must issue a decision. *See* 41 U.S.C. § 7103(f)(1)-(2). A failure to issue a decision is deemed a denial of a claim. *Id.* § 7103(f)(5). Then, review is available pursuant to Sections 7104(b)(1) and 7105(e)(1)(A). The D.C. District Court held further that a CO's decision binds GSA. *Crowley II*, 2023 WL 4846719, at *23.[10] Thus, as to Crowley's claim that GSA lacks the authority to conduct these audits and for the co-existence of the Transportation Act and the CDA, the D.C. District Court thoroughly examined every aspect, leaving no room for this Court to reach a different conclusion. When the decision on appeal is released, that decision will also have a preclusive effect on this Court. *See Laguna Hermosa Corp.*, 671 F.3d at 1288.

Here, Crowley's challenge to GSA's audit authority in FAR-based contracts was heard by the district court and is now on appeal with a higher court. Issue preclusion applies even though the case as to which preclusion is sought is on appeal. *See* Restatement (Second) of Judgments § 13 cmt. f. (1982); *Huron Holding Co. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 189 (1941) (holding that a pending appeal does not "detract from . . . [the] decisiveness and finality" of a judgment); *MaxLinear, Inc. v. CF CRESPE LLC*, 880 F.3d 1373 (Fed. Cir. 2018)

---

[10] After the D.C. District Court issued its decision, TRANSCOM removed the portion of section 1.12.19.1 that imposed the Transportation Act's dispute-resolution process rather than the CDA's. (*Compare* AR1764 with AR2007). The RFP was "modified after the D.C. District Court opinion to make clear that disputes would be resolved by appeal to the contracting officer and the CDA process." (OA Tr. 33:21–24).

("Issue preclusion applies even though the precluding judgment comes into existence while the case as to which preclusion is sought is on appeal."). Throughout the D.C. District Court proceedings, Crowley enjoyed comprehensive procedural safeguards. Additionally, Crowley had a vested interest in seeking an injunction to cease audits of its contract. This legal battle persisted for nearly two years in the district court, during which Crowley presented its arguments across multiple briefs. As a result, the current issue has undergone extensive litigation and is now being revisited in this context. Because of this, the Court is precluded from examining Crowley's argument as to GSA's authority to audit the DFTS II contract.

Further, Crowley would have this Court disregard the D.C. District Court's ruling entirely; this Court declines to do so. (OA Tr. 22:24–23:4 (Crowley: The perfect judgment would be . . . if the Court were to resolve, you know -- get into all of the substantive issues, but ultimately to strike those two PWS provisions as either unlawful . . . basically disregard or take issue with Judge Howell's decision and reach a different issue on the law[.])). Acting in response to a District Court order on a different iteration of the same contract cannot be said to be unreasonable. An action is unreasonable when it is "not guided by reason," and is "irrational or capricious." *Unreasonable*, Black's Law Dictionary (11th ed. 2019). Similarly, an action is arbitrary when it is "made without consideration of or regard for facts, circumstances, fixed rules, or procedures." *Arbitrary*, Black's Law Dictionary (11th ed. 2019). Here, it is evident that the agency considered the relevant facts, circumstances, and the law of the case. A more unreasonable or arbitrary action would be to disregard the D.C. District Court's findings and go entirely rogue. Being precluded from substantial analysis of issues before the D.C. District Court, the Court cannot find that the United States acted unreasonably by conforming the PWS to the *Crowley II* decision.

ii. TRANSCOM has the authority to dictate the terms of its contracts.

Crowley argues that even if GSA has audit authority, TRANSCOM unlawfully classifies the awardee as a "carrier" when that is not a requirement for performance. (Pl.'s MJAR at 19; OA Tr. 20:7–12). Section 1.12.1.1 of the PWS states that the "Contractor is deemed to be a carrier and/or freight forwarder for purposes of this contract." (AR2000). Crowley believes that this PWS clause is erroneous because the contractor will not act as a carrier or freight forwarder under the anticipated contract. (Pl.'s MJAR at 2–3 ("TRANSCOM cannot simply 'deem' the contractor, who will not act as a carrier, to be a carrier or freight forwarder in order to bring the contractor within the jurisdiction of the Transportation Act.")). In support of its argument, Crowley argues that this Court should look to the Interstate Commerce Act, not TRANSCOM's "self-serving assertion" to determine if the DFTS II contractor will act as a carrier. (*Id.* at 19). The Court finds that this term is illustrative of TRANSCOM dictating the terms and managing its own contract; that is not erroneous, arbitrary, or capricious.

Under the Interstate Transportation Act, a carrier is defined as a "motor carrier, a water carrier, and a freight forwarder." 49 U.S.C. § 13102(3). In turn, a "motor carrier" provides "motor vehicle transportation for compensation." *Id.* § 13102(14). "Motor vehicle transportation" is defined to include motor vehicles, equipment related to the movement of property, and services related to movement of property, such as "arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange." *Id.* § 13102(23). A "freight forwarder" is defined as an entity or

9

person that "provide[s] transportation of property for compensation" and "assembles and consolidates" shipments, "assumes responsibility" and makes use of carriers. *Id.* § 13102(8). The United States argues that "these motor carrier and freight forwarder activities are required of the DFTS II contractor." (Def.'s xMJAR at 20).

In applying the governing principles of contract interpretation, courts must begin with the plain language of the solicitation. *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004) "If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning. . . ." *Id.* Courts must also interpret the solicitation as a whole, "in a manner that harmonizes and gives reasonable meaning to all of its provisions." *Id.*; *see also NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous."). Per the DFTS II PWS, the contractor will hire carriers to perform shipments as subcontractors. (AR1979, 2000, 2003 (PWS §§ 1.4.1, 1.12.1, 1.12.1.2.1, 1.12.8); *see also* AR1858 (defining "Subcontractor" to mean a "transportation provider," including "carrier," "freight forwarders," and "transportation service providers," and not "the prime Contractor"). Section 1.12.2.1 of the PWS explicitly states that the DFTS II contractor ultimately holds legal responsibility for transportation, stating: "[w]hether the Contractor functions as a transportation provider itself or enters into an arrangement with a transportation provider, the Contractor shall be liable to the Government for the property transported under this contract while the property is in the possession of the transportation provider." (AR2001).[11] The United States also points out that the PWS explains that the contractor will "provide commercial pickup and delivery of trucking shipments" and will "provide all types of equipment necessary to safely transport freight." (Def.'s xMJAR (citing AR1739)). The PWS also states that the contractor will "provide the following storage requirements including, but not limited to, temperature-controlled secure warehouse space and labor, inventory management, transit in and out of the storage facility, and visibility and reporting." (AR1754). Notably, the United States highlights that the DFTS II contract imposes liability on the holder of the prime contract. (OA Tr. 41:17–18).

It is well-settled that the government's "general authority to make[ ] contracts" includes the "power to choose with whom and upon what terms the contract[ ] will be made . . . unless Congress has placed some limit on it." *Confederacion de Asociaciones Agricolas del Estado de Sinaloa, A.C. v. United States*, 32 F.4th 1130, 1140 (Fed. Cir. 2022) (citing *Arizona v. California*, 373 U.S. 546, 580, (1963)); *see also United States v. Winstar Corp.*, 518 U.S. 839, 884 (1996) ("[T]he Government's practical capacity to make contracts . . . [is] 'the essence of sovereignty' itself." (quoting *United States v. Bekins*, 304 U.S. 27, 51–52 (1938))). TRANSCOM has the authority to create its own solicitation terms so long as they do not contravene statute. Therefore, considering the prime contractor a "carrier" for purposes of DFTS II is within the agency's power.

Explicitly declaring the carrier requirement, which is ostensibly not a factor in technical evaluations, is evidence of TRANSCOM dictating its own contract terms. (*See* AR1617

---

[11] Crowley does not dispute this responsibility. (Pl.'s Mot. at 20 ("[T]he RFP makes the prime contractor responsible to [ ]TRANSCOM for ensuring the PWS is carried out[.]")).

("Industry recommended using a best value trade-off source selection with criteria related to past performance, technical capability, systems capability, implementation, subcontracting plans, and price." "[ ]DFTS II is anticipated to incorporate a best value trade-off between past performance and price with a pass/fail technical factor which evaluates a contractor's systems capability, carrier management, implementation, quality control, and small business subcontracting."); *see also* AR1656 (TRANSCOM's capability assessment of Crowley, finding it "capable and highly experienced as it is the incumbent DFTS contractor." Silent as to status as a carrier.)). Status as a carrier is exclusive to audit purposes and managing the DFTS II contract. Simply disagreeing with a term, without demonstrating its illegality or error, does not justify excluding it from a contract. *See Banknote Corp. of Am., Inc.*, 56 Fed. Cl. at 384 (finding an offeror's mere disagreement with the agency's judgment is insufficient to establish that the agency acted unreasonably). Crowley has not shown that the addition of Section 1.12.1.1 to the PWS, (AR2000), is outside the scope of TRANSCOM's power.

### iii. Crowley has not shown the existence or appearance of an OCI.

Crowley further contends that TRANSCOM failed to properly address and mitigate OCIs inherent in the solicitation process. (Pl.'s MJAR at 34). Specifically, Crowley argues that GSA delegates its audit responsibilities to a third-party contractor compensated solely from the recovered overcharge funds pursuant to the Transportation Act. (*Id.*). This setup, Crowley asserts, creates a conflict of interest, as the audit contractor has an incentive to identify overcharges, directly benefiting itself. (*Id.* at 35). Therefore, Crowley argues that the solicitation inherently poses a conflict of interest due to the potential for the audit contractor to make recommendations benefiting its own interests. (*Id.*). The United States maintains that any such conflict does not constitute an impermissible OCI under the FAR. (Def.'s xMJAR at 26). The Court agrees with the United States.

Because DFTS II is FAR-based, TRANSCOM is required to "[i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible; and . . . [a]void, neutralize, or mitigate significant potential conflicts before contract award." FAR 9.504(a). An OCI exists where "a person is unable or potentially unable to render impartial assistance or advice to the Government." FAR 2.101. Determining conflicts of interest involves a detailed examination that demands significant discretion. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1382 (Fed. Cir. 2009). A protester must present concrete facts indicating an actual or potential conflict; merely implying or suspecting such a conflict is insufficient. *Turner Constr. Co., Inc. v. United States*, 94 Fed. Cl. 561, 573 (2010), aff'd, 645 F.3d 1377 (Fed. Cir. 2011).

Crowley contends that a "serious and unmitigated OCI, or at the very least an 'appearance' of conflict of interest, arises by virtue of PWS Sections 1.12.1.1 and 1.12.19.1, which apply the Transportation Act and its profit-motivated commission or 'bounty'-based audit

process to the contract.'"[12] (Pl.'s MJAR at 35). Crowley continues that GSA's auditing contractor, CT Logistics, and its auditors are persons "unable or potentially unable to render impartial assistance or advice to the Government," "because they are paid a percentage of the amount they recommend GSA deduct and only paid on amounts collected." (Pl.'s MJAR at 35 (quoting FAR 2.101)).

For its part, the United States contends that there is no legal basis to support the proposition that an OCI can arise from the actions of a separate agency acting within its statutory authority. (Def.'s xMJAR at 27 ("This protest is not a vehicle to challenge any alleged OCI Crowley might identify on another contract: Crowley does not claim to be an 'interested party' for a procurement by GSA for auditors.") (citing 28 U.S.C. § 1491(b)(1); *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023))). The Court agrees there is no evidence that GSA's auditing contractor would be an interested party for purposes of bid protest standing. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) ("To be an interested party, a protester must show that: (1) it was an actual or prospective bidder or offeror; and (2) it had a direct economic interest affected by the award of the contract."). Based on the administrative record, it is evident that the DFTS II procurement does not involve soliciting auditing services, nor does Crowley conduct audits for GSA. (*See generally* AR). Any incentives provided by GSA to its auditor result from GSA's contract with that auditor, which is independent of the DFTS II procurement. As the United States argues, "even viewed broadly, the RFP presents neither scenario in which the FAR's OCI provisions apply, because GSA's contract for audit services is neither the 'instant contract' nor is there a question of a conflict 'on a future acquisition.' . . . GSA audits do not put Crowley and other offerors in different competitive positions regarding the DFTS II procurement." (Def.'s xMJAR at 28 (citing FAR 9.502(c))).

Further, Crowley's arguments pertain to a purported conflict regarding the execution of GSA's third-party audit contracts, rather than the DFTS II contract itself. To establish an impaired objectivity OCI relevant to the DFTS II contract, the contractor responsible for auditing GSA would need to additionally submit a bid for the DFTS II contract. *See Rex Serv. Corp.*, 448 F.3d at 1307. Otherwise, the GSA contractor is not in a position where conflicting interests arise concerning the execution of the DFTS II contract. Crowley has not alleged that GSA's audit contractor has indeed submitted a proposal—or intends to do so—for the DFTS II contract. (*See generally* Pl.'s MJAR). Even viewed broadly, the RFP presents neither scenario in which the FAR's OCI provisions apply, because GSA's contract for audit services is neither the "instant contract" nor is there a question of a conflict "on a future acquisition." *See* FAR 9.502(c). On a conceptual level, the RFP falls within neither of the two "underlying principles" the FAR sets out as rationales for avoiding OCIs: to prevent conflicting roles and to prevent unfair competitive advantage. *See* FAR 9.505. Simply put, the OCI framework does not apply to the facts here.

As the matters under examination in the district court, presently under appeal, mirror the facts and concerns pertinent to Crowley's challenge concerning the legality of incorporating the

---

[12] 31 U.S.C. § 3726(e) requires GSA to finance its Transportation Act audits "from overpayments collected from carriers on transportation bills paid by the Government," and that "[p]ayment to any contractor for audit services shall not exceed 50 percent of the overpayment identified by contract audit."

Transportation Act into the DFTS II solicitation, Crowley's protest points are deemed ineligible for consideration. Moreover, Crowley has not substantiated any exceeding of authority by TRANSCOM when it included the contractual provision designating the awardee as a carrier. Crowley also fails to show that an OCI can arise from the actions of a separate agency acting within its statutory mandate. Given Crowley's lack of success on the merits, injunctive relief is not warranted.

### C. Motion to Complete or Supplement the Record

After the dispositive motions were fully briefed, Crowley moved for leave for the parties to address whether the United States must complete and supplement the Administrative Record with, or, alternatively, whether the Court should take judicial notice of, "newly discovered materials that contradict the United States' representations regarding its understanding of the statutes and regulations at issue[.]" (Mot. for Jud. Not. & Completion or Suppl. of the Administrative. R., ECF No. 20 ("Pl.'s Mot.")). Crowley characterizes its smoking gun as a letter from DoD to Congress stating that the Transportation Act, as interpreted by the D.C. District Court "requires a contractor performing a FAR-based contract to submit to the dispute resolution procedures of GSA instead of those contained in the CDA." (Mot. to Amend Schedule at 2, ECF No. 19). For the following reasons, the Court denies Crowley's motion.

The ability to submit additional information into an administrative record is limited. *Axiom Res. Mgmt.,* 564 F.3d at 1379. The purpose of limiting review to the record before the procuring agency is to prevent courts from using new evidence to "convert the 'arbitrary and capricious' standard into effectively *de novo* review." *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005). Because the focal point for judicial review is the agency's administrative record, "the standard for discovery in the bid protest is narrower," than in non-bid protest cases. *Proxtronics Dosimetry, LLC v. United States*, 128 Fed. Cl. 656, 681 (2016); *see also Murakami*, 46 Fed. Cl. at 735 ("[E]xceptions to the general rule against extra-record evidence is based upon necessity, rather than convenience, and should be triggered only where the omission of extra-record evidence precludes effective judicial review.").

Crowley's motion is three-fold and asks the Court to consider three different standards. (*See* Pl.'s Mot.); *see also Smith v. United States*, 114 Fed. Cl. 691, 695 (2014), *aff'd,* 611 F. App'x 1000 (Fed. Cir. 2015) ("The standards for the admission of additional documents to the administrative record differ depending on whether the proposed document would complete the filed administrative record, or supplement it."). First, the Court will address Crowley's request to complete the record. A motion to complete the record seeks to add documents that were considered by the agency and relevant to the challenged decision. *See BHB Ltd. P'ship v. United States*, 147 Fed. Cl. 226, 229 (2020). However, the government's designation of the administrative record is presumptively complete. *Poplar Point RBBR, LLC v. United States*, 145 Fed. Cl. 489, 494 (2019) (citing *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993)). To rebut this presumption, this Court has required "clear evidence of material that was generated or considered by the agency but excluded from the record[.]" *BHB Ltd. P'ship*, 147 Fed. Cl. at 229 (citing *Poplar Point*, 145 Fed. Cl. at 494); *see also Linc Gov't Servs., LLC v. United States*, 95 Fed. Cl. 155, 158 (2010). This is inapplicable to the documents Crowley cites. Crowley's objections to the solicitation stem from the changes TRANSCOM made to the RFP on

August 8, 2023. The legislative proposal dated March 19, 2024, (Mot. to Amend Schedule Ex. 1 at 1, 20, ECF No. 19-1), is akin to a post-hoc rationalization. Mere speculation about potential coordination between TRANSCOM and the Assistant Secretary of Defense, Legislative Affairs, does not rise to the level of clear evidence that was excluded from the record. (*See id.*). It is unclear how a document released seven months after the disputed decision could have influenced the agency's decision-making process.

The Court must grant a request to supplement the administrative record or conduct discovery in a bid protest only "if necessary for effective judicial review or if the existing record cannot be trusted." *Diversified Maint. Sys. v. United States*, 93 Fed. Cl. 794, 802 (2010) (internal quotations omitted); *cf. Axiom Res. Mgmt.*, 564 F.3d at 1381. Only in extremely limited circumstances is supplementation of the administrative record appropriate, such as where the agency failed to consider relevant factors or where there is some evidence of bad faith or improper behavior by agency officials. *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 339, 342 (1997)); *see also Axiom*, 564 F.3d at 1379 (citing *IMS, P.C. v. Alvarez*, 129 F.3d 618, 624 (D.C. Cir. 1997)). This Court is limited to supplementing the record in instances in which it can "explain why the evidence omitted from the record frustrated judicial review as to the ultimate question of whether [the agency action] was arbitrary and capricious." *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (citing *Axiom*, 564 F.3d at 1379–80).

The Court is not convinced that the document aids judicial review. There is no law that federal agencies must enjoy the logistics governing their contracts. Nothing prevents TRANSCOM from seeking modifications to the law going forward, which this document exemplifies. TRANSCOM explained that it amended the DFTS II solicitation to be consistent with the statutory interpretation propounded by the district court. (Def.'s xMJAR at 24). Its legislative proposal does not detract from this statement. (*See* Mot. to Amend Schedule Ex. 1). In fact, the proposal addresses the D.C. District Court's interpretation and explains its logistical concerns:

> More recently, in the case of *Crowley Government Services, Inc., v. GSA*, *et al.*, . . . Crowley brought an action seeking declaratory and injunctive relief to halt the GSA's audit of a transportation contract with the DOD on the basis that the GSA lacks authority to audit FAR-based contracts under the TA. On July 28, 2023, the District Court issued an order affirming the GSA's authority to audit FAR-based contracts under the Transportation Act *but finding that the GSA had no authority to deviate from the contracting officer's final decision on any alleged overpayment*. The Court opined that GSA is relegated to an *advisory capacity* under its interpretation of the relevant guidance. However, if the Agency agrees with the GSA related to the audit findings, but the contractor disagrees, then according to the Court, the Agency would refer that dispute to the GSA under 31 U.S.C. § 3726(c). While the District Court's ruling reinforces the goal of this legislative proposal, in the District Court's own words, the "bureaucratic nightmare" and "cautionary tale" of this litigation highlights the need for clear statutory guidance in this arena.

(Mot. to Amend Schedule Ex. 1 at 3 (emphasis added)). Further, TRANSCOM admits that legislation could clarify the correct classification of contracts and audits. (OA Tr. 40:17–18). That TRANSCOM would seek to engage the legislative process to amend the CDA and Transportation Act does not alter its intentions, or legal obligations, regarding the DFTS II RFP. Thus, consideration of its legislative proposal does not aid the Court in effective review of the issues before it.

Crowley alternatively asks the Court to take judicial notice of DoD's legislative proposal. The Court acknowledges that, generally "publicly available documents" may be "freely cited" even without being included in the administrative record. *See Harkcon, Inc. v. United States*, 132 Fed. Cl. 697, 701 (2017) (citing Fed. Rules of Evid. ("FRE") 201). Because courts must supplement the administrative record only out of necessity, it would be inappropriate to include publicly available documents. The Court may take judicial notice of those documents, but notice must be consistent with the provisions of FRE 201. *Confidential Informant 59–05071 v. United States*, 134 Fed. Cl. 698, 711 (2017), *aff'd*, 745 Fed. Appx. 166 (Fed. Cir. 2018) (mem.) (citations omitted).

FRE 201(a) defines the scope of judicially noticeable facts as "adjudicative fact[s] only, not . . . legislative fact[s]." FRE 201(b) permits this Court to "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." When taking judicial notice pursuant to a request of the parties, the Court must be "supplied with the necessary information." FRE 201(c)(2). Courts have previously taken judicial notice of definitions in dictionaries and encyclopedias; the outcome of previous judicial decisions; and addresses of government buildings. *Big Easy Studios, LLC v. United States*, 147 Fed. Cl. 539, 547 (2020) (citations omitted).

Conversely, courts have declined to take judicial notice of findings of both fact and law in related court proceedings in another court; news articles and press releases; and the authenticity of various documents and statements contained therein. *Id.* (citations omitted). As the United States points out, this Court has taken judicial notice in past bid protests, to aid in the construction of background information and explanation, not support for a party's merits arguments. (Def.'s Resp. at 8, ECF No. 24 (citing *Connected Glob. Sols., LLC v. United States*, 160 Fed. Cl. 420, 427 (2022) (taking judicial notice of a publicly available glossary and list of acronyms); *Harkcon, Inc.*, 132 Fed. Cl. at 701 (taking judicial notice of the Coast Guard's publicly available investigations manual))). Because the Court has found that the document does not aid in judicial review, it finds that judicial notice of the documents would be inappropriate as well.

### III. Conclusion

The Court is precluded from encroaching on the D.C. District Court's rulings. Otherwise, Crowley has not met its burden to show that the terms of the DFTS II RFP are arbitrary, capricious, or contrary to law. Likewise, Crowley has not shown that the consideration of DoD's legislative proposal would assist the Court in its review of these issues. Crowley's Motion to Complete or Supplement the Record, (Pl.'s Mot., ECF No. 20), is **DENIED**. Crowley's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 14), is **DENIED**. The United

States' Motion for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No. 15), is **GRANTED**.

The Clerk is **DIRECTED** to enter judgment accordingly. The parties shall meet and confer and file a Joint Status Report proposing redactions to this memorandum opinion by June 6, 2024 to allow the Court to file a public version of the opinion.

**IT IS SO ORDERED.**



s/     David A. Tapp
DAVID A. TAPP, Judge